THE NEW JERSEY ZINC COMPANY *vs.* THE NEW JERSEY FRANKLINITE COMPANY.

THE BOSTON FRANKLINITE COMPANY *vs.* THE NEW JERSEY ZINC COMPANY.

The usual and appropriate meaning of the word "premises" in conveyances is, "the thing demised or granted by the deed."

It is the inflexible rule of law that a deed, except in cases of latent ambiguity, must be construed according to the legal effect and meaning of its terms unaffected by extrinsic evidence.

A mere agreement to transfer the property and stock of an incorporated company cannot affect its legal existence, nor will the actual transfer of all the real and personal estate of the corporation, including the stock itself, extinguish its charter.

The Sussex Zinc and Copper Mining and Manufacturing Company conveyed to the New Jersey Zinc Company "all the zinc and other ores, *except franklinite and iron ores*, found or to be found in or upon certain premises; the title and interest of the former company became afterwards legally vested in the Boston Franklinite Company. It appeared that the two ores, zinc and franklinite, existed in the mine in close mechanical combination, so that the one could not be removed without the other; but that at the date of the conveyance the masses or veins on the premises in question were regarded and known as franklinite. *Held*—

1st. That the exception in the deed was not limited to the franklinite and iron ores, where they existed *separate and apart from the zinc*.

2d. That the grantor retained a freehold estate in the thing excepted, and the grantee acquired a freehold estate in the thing granted, and that the terms "zinc ores" and "franklinite and iron ores" were used as a description of the land granted and reserved.

3d. That in construing the deed reference must be had, in order to ascertain the intention of the parties, to the existing state of knowledge of the subject matter, the received meaning of the terms employed, and the usages prevailing at the date of the conveyance.

4th. That by the term "zinc ores," as used in the deed, was meant those veins in which the ore of zinc was the predominating one, and by franklinite not the pure mineral of that name, which was never found except in small and detached specimens, but those veins in which franklinite predominated, and which were known and designated as franklinite ore.

A deed for a mine with mining privileges is not a mere license to take away ore, or the grant of an easement, but of a part of the freehold.

A court of equity will rarely interpose by injunction to restrain the working of mines until the right is established at law.

*Hamilton* and *McCarter*, for Franklinite Company.

*Bradley* and *Zabriskie*, for Zinc Company.

THE CHANCELLOR. On the 24th of July, 1857, the New Jersey Zinc Company filed their bill in this court for an injunction to restrain the New Jersey Franklinite Company from mining and carrying away zinc ore, to which the complainants claimed title, from part of a tract known as the Mine Hill farm, in the county of Sussex. The complainants, by their bill, claimed title to all the metals,

or ores containing metals, found or to be found upon the tract in question, " excepting the metal or ore called franklinite and iron ores, *when it exists separate from the zinc.*" They insisted that the true intent and meaning of the several indentures under which they claim title is, that whenever, on the said premises, there is an admixture of zinc or other ore with the franklinite, they have the sole and absolute right to the said ore; and that the Franklinite Company have no right to mine and carry away any of the zinc ores found on said premises, no matter with what quantity of franklinite they may be found in connection. They claimed that zinc was the predominating ore in the opening where the Franklinite Company were mining; that the defendants had no right to the said ores, and prayed an injunction to restrain them from mining or carrying away from the said tract any of the zinc ores or other ores found upon the said tract, except franklinite and iron ores, when they exist separate from zinc ore. An injunction issued pursuant to the prayer of the bill. Upon the coming in of the answer, the injunction was modified so as to restrain the defendants from mining or carrying away any of the zinc or other ores found upon the premises, except franklinite and iron ores.

The Franklinite Company, by their answer, admitted that the complainants were entitled to all the zinc and other ores upon the said tract except franklinite and iron ores, but claimed title in themselves to all the franklinite and iron ores existing therein. They alleged that the veins of ore upon the Mine Hill tract were franklinite veins, from the preponderance of that ore therein, the ore in excess giving name and character to the vein, except in the case of the precious metals, gold and silver being found in appreciable quantities; that franklinite ore has never been discovered separate from zinc ore, and that the respective veins of zinc and franklinite in the county of Sussex contain both metals mechanically combined,

the vein taking its name and character from the predominating ore.

Subsequent to the filing of the answer, the title of the New Jersey Franklinite Company, under the foreclosure and sale of a mortgage executed by them, became vested in the "Boston Franklinite Company," a corporation organized under the laws of this state. On the 17th of October, 1860, the Boston Franklinite Company filed a bill, in the nature of a supplemental bill, against the parties in the foregoing suit, therein alleging that they have become seized of and entitled to all the ores and minerals formerly owned by the New Jersey Franklinite Company in the Mine Hill tract, concerning which the controversy in said suit had arisen; that, by virtue of such title, they are the sole owners, and have the exclusive right to all the franklinite and iron ores found in that part of the Mine Hill tract described in the original bill of complaint, whether said franklinite and iron ores are found mixed with zinc ores or separate therefrom; and that, having acquired title pending the suit against the New Jersey Franklinite Company, they cannot, by reason of the said injunction, safely commence operations in mining the said ores, until the title thereto shall be determined by the court.

They charge that the New Jersey Zinc Company are mining and carrying away large quantities of the ores in controversy, which they insist is franklinite ore and the property of the Franklinite Company, under the pretence that the said ore is red oxide of zinc, because of the admixture of a small quantity of red oxide of zinc therein, under the claim set up by them, in their original bill, that whenever there is any zinc ore found on Mine Hill, they are entitled to take the same, no matter how much franklinite may be found in connection therewith. They pray an account of all the ores carried away, and that the Zinc Company may be restrained from mining or carrying away any franklinite or iron ore found on Mine Hill afore-

said, or from mining or carrying away any of the ores or minerals in controversy between the parties in the original cause. An injunction issued pursuant to the prayer of the bill.

The New Jersey Zinc Company, by their answer to the supplemental bill, assert and contend that the Boston Franklinite Company are only the owners of the franklinite and iron ores found or to be found on the said premises when the said franklinite and iron ores exist separate and distinct from the zinc; that by means of more extended openings and workings of the main vein of ore on Mine Hill, and more accurate examinations and analyses of the different portions thereof, it has been ascertained that no part of said vein consists of franklinite or iron ore separate and distinct from zinc, and therefore that no part thereof can or does belong to the Franklinite Company, but the whole thereof belongs to the Zinc Company.

They further allege, that whether a particular ore shall be called a zinc ore, or a franklinite or iron ore, does not depend on the preponderance in weight of zinc or oxide of zinc on the one hand, or of franklinite or oxide of iron on the other, but on the relative value of the respective products, after taking into account the expense of extracting the same. And they deny that franklinite is the principal ingredient taken by them from the said tract. A large amount of evidence has been taken in support of the claims of the respective parties, and the causes are now brought on for final hearing upon the pleadings and proofs.

Two issues are made by the pleadings, upon the decision of which the rights of the parties and the result of the cause depend.

I. Are the Boston Franklinite Company entitled only to the franklinite and iron ores found on the said tract, when the same exist separate and distinct from zinc.

II. Is the ore in question a zinc ore, within the true

construction of the deeds under which the Zinc Company claim title.

The whole controversy depends upon the decision of one or both of these issues. If the first issue is answered in the affirmative, if the Franklinite Company are entitled only to the franklinite and iron ores when existing *separate and distinct from zinc,* they have no title to the ores in controversy; for it is alleged by both parties, and shown satisfactorily by the evidence, that franklinite is always found in the mines of Sussex in mechanical combination with zinc, and never separate and distinct from it, in masses sufficient to make it worth the labor of mining. Neither party claims title to the surface of the land in which the ores are found. The Zinc Company have an unquestioned title to all the metals, or ores containing metals, existing in the premises, excepting franklinite and iron ore. The Franklinite Company have title to the franklinite and iron ores when they exist separate and apart from zinc. Who has title to the franklinite and iron ores when they are found in mechanical combination with the zinc? An answer to this inquiry renders necessary a recourse to the origin and history of the titles of the respective parties to the premises in dispute.

On the 10th of March, 1848, Samuel Fowler, then being the owner of the Mine Hill tract, upon which the ores in question are found, by deed, executed by himself and Henrietta his wife, conveyed to the Sussex Zinc and Copper Mining and Manufacturing Company, for the consideration of twenty thousand shares in the capital stock of the said company, " all the zinc, copper, lead, silver, and gold ores, and also all other metals, or ores containing metals, (excepting the metal or ore called franklinite and iron ores, when it exists separate from the zinc,) existing, found or to be found on five contiguous tracts in the township of Hardyston," one of which is the Mine Hill farm, including the tract in question.

. On the same day, by deed of even date, executed by and

between the same parties, Fowler and wife conveyed to the Sussex Zinc and Copper Mining and Manufacturing Company " all the metal, mineral, or iron ore, usually designated and known by the name of franklinite, found or to be found on, upon, or in a certain tract of land," in the said deed particularly described, being a portion of the Mine Hill tract, and included, as it is understood, within the limits of the tract specified in the first mentioned deed. This last deed it is admitted does not cover the premises in controversy, and is in no wise material to the present inquiry, except as a part of the history of the title, and as illustrating, by the phraseology of the grant in contrast with the terms of the first deed, that the significancy of the exception, which constitutes the germ of this controversy, was fully appreciated by the parties, or at least by the grantor. In the one deed, a conveyance is made of all the zinc and other metals, or ores containing metals, existing in the land, " excepting the metal or ore called franklinite, when it exists separate from the zinc," in the other, the grant is of " all the metal, mineral, or iron ore usually designated and known by the name of franklinite;" and the language of the exception in the first deed is made the more significant, and the importance attached to it by the parties rendered more obvious, by a recurrence to the original deed, from which it appears that the language of this exception, which occurs twice in the instrument, was altered after it was drawn and before execution. As drawn, the clause excepted the franklinite, when it exists separate from *other ores or metals,* or as it was afterwards expressed, " excepting the ore called franklinite, when it exists in a separate distinct state from other ores." In both clauses the words *other ores* are erased, and the words "*the zinc*" inserted. The significance of this alteration cannot be overlooked.

Samuel Fowler, the grantor in these deeds, having, after the making thereof, purchased and procured releases and deeds of quit-claim and grants of and to the said pre-

mises, or of some interest therein, or some parts thereof, by a deed of confirmation, bearing date on the —— day of March, 1849, acknowledged and recorded on the 26th day of May, 1849, ratified and confirmed to the grantees the aforesaid deeds, and the grants and conveyances of the premises therein, or in either of them described and conveyed, and all the rights, privileges, and immunities therein, or in either of them named and granted. This deed, like the last preceding deed, is material to our inquiry only because it recites at length and ratifies the deed of the tenth of March, 1848; thus adopting and reaffirming the phraseology of the exception a year after the deed was executed.

This deed, by its terms, conveyed to the Sussex Zinc and Copper Mining and Manufacturing Company all the metals and ores containing metals existing in the premises, excepting the franklinite, when it exists separate from the zinc. The franklinite and iron ores, when found in mechanical combination with zinc, were not excepted, and passed by the terms of the grant to the grantees.

On the 8th of March, 1852, the Sussex Zinc and Copper Mining and Manufacturing Company, being seized of all the rights acquired by virtue of the foregoing deeds of conveyance, by deed of that date, conveyed to the New Jersey Zinc Company "all the zinc and other ores, except franklinite and iron ores," found or to be found in or upon the premises therein described, which are the same premises described in the first mentioned deed from Fowler to the Sussex Company of the tenth of March, 1848. And by another deed, also bearing date on the same eighth of March, 1852, the Sussex Zinc Company also conveyed to the New Jersey Zinc Company "all the metal, mineral, or iron ore, usually known or designated by the name of franklinite, found or to be found on, upon, or in all that certain tract of land" therein described, and being the same tract described in the second deed from Fowler to the Sussex Company of the tenth of March,

2 E*

1848. These two deeds to the New Jersey Zinc Company of the eighth of March, 1852, purport to convey substantially the same rights with those conveyed by the two deeds of the tenth of March, 1848, from Fowler to the Sussex Company, except that in the deed to the Zinc Company, which covers the premises in dispute, the words "when it exists separate from the zinc," found in the deed from Fowler annexed to the exception of the franklinite, are omitted. The language of the description of the premises granted in the deed from Fowler to the Sussex Company is, "all the zinc, copper, lead, silver, and gold ores, and also all other metals or ores containing metals (except the metal or ore called franklinite, and iron ores, when it exists separate from the zinc) found or to be found," &c. In the deed from the Sussex Company to the New Jersey Zinc Company, purporting to be for the same premises, the phraseology of the description is, "all the zinc and other ores, *except franklinite and iron ores*, found or to be found," &c. The distinction in the effect, as well as in the terms of the two deeds, is too clear to admit of controversy. In the one, the exception extends only to the franklinite and iron ores *when it exists separate from the zinc*—in the other, all the franklinite and iron ores are excepted. By the one, all the franklinite and iron ores found in mechanical combination with the zinc passes to the grantee—in the other they do not.

After the description of the premises granted, the deed to the New Jersey Zinc Company contains the usual clause, in these words: "together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging," &c., "and also all the estate, right, interest, property, claim, and demand whatsoever, as well at law as in equity, of the said parties of the first part of, in, and to the above described *premises*, and every part and parcel thereof, with the appurtenances." It is urged that this language includes all the estate and interest of the grantors in the premises, and operates to pass to the

grantees all the franklinite and iron ores. But this construction would destroy the exception, and would operate to pass the absolute fee in the land itself. The term *premises*, in common parlance, is used to signify the land, with its appurtenances; but its usual and appropriate meaning in conveyance is " *the thing demised or granted by the deed.*" In this sense the term is here used. This clause was not intended to alter or enlarge the extent of the grant, but simply to convey all the grantor's interest in the thing granted. The same term is used in the deed, in the *habendum* clause, with obviously the same meaning: " to have and to hold all and singular the above mentioned and described *premises*, with the appurtenances." Its meaning in this clause, by well settled rules of construction, must be limited to mean the thing granted.

Two other grounds are taken in regard to the construction and effect of this deed from the Sussex Company to the New Jersey Zinc Company. It is insisted—

1. That the deed is to be interpreted by the aid of the previous agreement between the parties, in fulfilment of which the deed was executed.

2. That the alteration in the terms of the grant were fraudulently made in violation of the agreement under which it was executed, and that, if need be, the court will reform the deed to conform to the intention of the parties.

In regard to the first objection, it is a well settled and inflexible rule of law, that except in cases of latent ambiguity, the deed must be construed according to the legal effect and meaning of its terms unaffected by extrinsic evidence. The terms of the deed in question are clear. There is no doubt as to their meaning, and no room for construction apart from their obvious and legal import. If not in accordance with the true meaning and intention of the parties, the proper and only remedy is to reform the instrument, not to subvert its legal operation.

Was the deed fraudulently made, or, by mistake, not

made in accordance with the intent and agreement of the parties? and if so, may it be reformed to accord with such intention? Neither of these grounds are suggested in the original bill filed by the Zinc Company; on the contrary, they based their title and claim to relief upon the legal effect and operation of the deed itself. The New Jersey Franklinite Company, in their answer to the bill, say, "that in the conveyance of zinc ores on Mine Hill to the New Jersey Zinc Company, the description in the older deeds, "excepting franklinite or iron ore, when they exist separate and apart from zinc ore," was designedly changed, after full discussion in presence of both boards, by omitting the words "when they exist separate and apart from the zinc ore;" because the reservation qualified by these words became a contradiction and a nullity, and because the Franklinite Company intended to reserve to itself all the franklinite ore, whether connected with zinc or not. And that the directors of the New Jersey Zinc Company were present, and consented to and approved the striking out of the said words from the description in the original deed from Fowler and wife for the reasons aforesaid.

In the answer of the Zinc Company to the supplemental bill filed by the Boston Franklinite Company these allegations in the answer of the original defendants are denied, and it is alleged that the resuscitation of the Sussex Zinc and Copper Mining and Manufacturing Company, under the name of the New Jersey Franklinite Company, and the setting up by them of a claim to all the franklinite and iron ores on Mine Hill farm, whether existing separate and distinct from zinc or not, was a fraud on the Zinc Company; and if the deed from the Sussex Company to the Zinc Company of the eighth of March, 1852, does not, by a fair construction thereof, (as the defendants believed, and still believe it does,) fully convey all the ores and rights which were conveyed to the Sussex Company by Fowler and wife by the deed of

March 10th, 1848, the same ought to be reformed so as to correspond to the true intent and meaning of the agreement between the parties.

It is satisfactorily shown that the Sussex Zinc and Copper Mining and Manufacturing Company, being the owners of ores and mineral rights in Mine Hill and its vicinity, by grant from Fowler and the New Jersey Exploring and Mining Company, (the title of which company has since been changed to the New Jersey Zinc Company) owning ores and mineral rights at Stirling Hill, and being engaged in the manufacture of zinc at Newark, on the fourth of September, 1851, an agreement was entered into between the two companies, for their mutual interest, to unite their properties and to carry on their joint business under one organization, that of the New Jersey Exploring and Mining Company. The Sussex Company agreed to convey all their real and personal estate and all their capital stock not issued to individuals, and the New Jersey Exploring and Mining Company agreed to admit the whole stock of the Sussex Company to the same dividend as the stock of the New Jersey Company; the holders of the stock of each company to be entitled equally to all dividends, and to all the property, real and personal, of the two companies, the union being based upon the principle of entire equality between the stockholders of each company. The agreement recites that it was contemplated to apply to the legislature for an increase of the capital stock of the New Jersey Exploring and Mining Company, and in case of such increase the stock of the Sussex Company was to be surrendered, and the stock of the New Jersey Company issued in lieu thereof. The real and personal estate of the Sussex Company was to be transferred to the New Jersey Company, thus forming a complete union, and bringing together, and uniting under one charter, all the property, rights, and advantages owned by both said companies. This agreement is in

writing, and is formally executed under the seal of both companies.

By an act of the legislature, approved on the twelfth of February, 1852, the name of the New Jersey Exploring and Mining Company was changed to that of "the New Jersey Zinc Compnny." The said company were authorized to purchase and receive, and the Sussex Zinc and Copper Mining and Manufacturing Company were authorized to transfer, all the mines and mineral rights, or any part thereof, then owned by the latter company, upon such terms as the companies might agree upon; the capital stock of the company was authorized to be increased, and its stock issued as contemplated by the agreement between the two companies.

In further execution of the agreement between the parties, the Sussex Zinc and Copper Mining and Manufacturing Company executed to the New Jersey Zinc Company the two deeds of the 8th of March, 1852, already referred to, and transferred to them all the capital stock of the company not standing in the hands of private stockholders. Most of the stock in private hands was also surrendered, and new stock issued. A few of the shares, however, were not surrendered, nor was the charter of the company or its corporate rights surrendered or transferred. But on the 26th of January, 1853, a further supplement to the act was passed, by which the name of the Sussex Zinc and Copper Mining and Manufacturing Company was changed to that of the New Jersey Franklinite Company, and its capital stock increased to one million two hundred thousand dollars ($1,200,000). Under this charter, the New Jersey Franklinite Company claimed the right to exercise the corporate rights and franchises of the Sussex Zinc and Copper Mining and Manufacturing Company, and to hold title to the ores in question. It is obvious that the deed for the land was not in accordance with the terms of the agreement between the companies; and the withholding from the conveyance a part

of the property, and the resuscitation of the Sussex Company under a new name, is charged to be illegal and fraudulent.

There is nothing in the evidence which renders the charter of the New Jersey Franklinite Company inoperative, or which deprives them of the power of exercising the corporate franchises, or enjoying the rights of property which were held by the Sussex Zinc and Copper Mining and Manufacturing Company when the title of the company was altered.

I think it clear that the agreement between the Sussex Company and the New Jersey Exploring and Mining Company involved a transfer of the control of that charter to the latter company. There was, however, no express agreement for the sale or for the extinguishment of the franchises of the company. The chartered rights and privileges of the company, if the agreement had been carried into effect, would have been owned and controlled by the owners of the stock. A mere agreement to transfer the property and stock of the company could not affect its legal existence, nor could the actual transfer of all the real and personal estate of the corporation, including the stock itself, if legal, have extinguished the charter. But the agreement was never carried into effect. Neither the entire stock nor all the property of the corporation were transferred, in pursuance of the agreement, at the time the name of the company was changed. The bill admits that some of the shares were still outstanding, and it appears, from the evidence, that some of the directors delayed transferring their stock till the meeting of the legislature for the express purpose of having the charter renewed. The title to the ores in dispute was not transferred. The act of February 12th, 1852, the passage of which was contemplated in the agreement between the companies, and which was designed to carry the agreement into effect, does not appear to contemplate the necessary extinction of the Sussex Company. It simply au-

thorizes a transfer of all its mineral rights, or any portion thereof.

The legislature, by the passage of the supplement of 1853 to the charter of the Sussex Company, changing its name to the New Jersey Franklinite Company, and enlarging its capital stock, recognised and affirmed the continuance of the corporation and of its chartered rights and privileges. There is nothing that renders the act of the legislature legally inoperative. The legal existence of the Franklinite Company as a corporation has been unquestioned from that day to this, and is recognised by the Zinc Company themselves. The legal existence of the company, and their right of acquiring, holding, and transmitting property, in accordance with the terms of the charter originally granted to the Sussex Company, cannot now be doubted.

In the original bill of the New Jersey Zinc Company, it is alleged that the act of the legislature of 1853, changing the title of the Sussex Zinc and Copper Mining and Manufacturing Company to the New Jersey Franklinite Company, was passed at the instance and request of the first named company. In their answer to the supplemental bill, it is alleged that this admission was made by mistake, and that in fact the act was procured by persons having no interest in the stock for sinister purposes, and that resuscitating the company under a new name, and setting up by them of a claim to the franklinite and iron ores on Mine Hill, was a fraud on the Zinc Company. Conceding the truth of the allegation, (of which I find no competent evidence) it will not affect the result of the inquiry. The validity of the charter cannot depend upon the motives with which it is procured, nor upon the integrity of those at whose instance it is granted. Nor can the mere continuance or resuscitation of the company under a new name operate as a fraud upon the Zinc Company. It is not the resuscitation of the charter or the continuance of the corporation that operates as a fraud

upon the rights of the Zinc Company, but the claim that is set up to the ores and mining rights claimed by them, and which were not transferred pursuant to the agreement.

The whole inquiry terminates in this—was the change in the terms of the grant made by the Sussex Zinc and Copper Mining and Manufacturing Company to the New Jersey Zinc Company, by the omission of the clause contained in the deed from Fowler, "when it exists separate from the zinc," fraudulently made? It is clear that the omission is not in accordance with the terms of the original agreement between the parties of the fourth of September, 1851, under which the transfer was made. The complainants allege that it was done fraudulently and without the assent of the grantees. The defendants insist it was done, after full discussion, with the knowledge and consent of the directors of both companies.

Fraud is never presumed. The legal presumption is in favor of the good faith of the transaction. The conveyance was made and accepted some months after the execution of the agreement, and the presumption must be that the terms of the contract were changed after it was made and before the deed was executed. The burthen of proof is upon the party alleging the fraud. The mere variation between the terms of the agreement and the deed is not sufficient.

The complainants prove, by C. E. Detmold, that the agreement between the companies was carried out in substance; that the Zinc Company recognised it as binding, and carried it out in good faith. This witness was president of the company from 1853 to 1856. His first connection with the company was in November, 1852. This was after the execution of the deed to the Zinc Company. He has no knowledge of the circumstances which attended the execution of the deed, or of the negotiations which led to it.

Richard Jones was a director of the New Jersey Ex-

ploring and Mining Company in 1851.  He testifies that he was present at the meeting of the directors of the two companies when the agreement of the fourth of September, to amalgamate the two companies, was made; and neither at that time, nor at any subsequent time, heard any discussion as to changing the phraseology of the deed to be given to the New Jersey Exploring and Mining Company from that contained in the deed from Fowler to the Sussex Zinc and Copper Mining and Manufacturing Company. He ceased to be a director of the Zinc Company in May, 1852; thinks he was not a director when that company accepted the deed from the Sussex Company, and ordered it to be recorded, and does not know when that was done. The deed, though dated in March, 1852, was neither acknowledged nor recorded till April, 1853.  All this evidence is merely negative.  It does not prove the fraud, nor disprove the allegation of the defendants, that the deed was accepted with the altered phraseology in execution of the agreement.

The defendants have called four witnesses, Alexander C. Farrington, Samuel Fowler, James L. Curtis, and Silas M. Stilwell, who testify substantially, that after the deed had been prepared, a meeting of the directors of each company was called, the phraseology of the deed in the description of the premises, which corresponded with the description in the deed from Fowler, was objected to, the subject was discussed between the directors of the two companies, a new deed was ordered to be drawn, the deed, as amended, was read to the board of directors of the New Jersey Zinc Company, the alteration in its phraseology made the subject of discussion, and was accepted by the directors with knowledge of the change, and of the reasons for making it.  Three of these witnesses, Farrington, Fowler, and Curtis, were directors of both companies, and all participated in the discussions at the boards touching the change in the phraseology of the deed.  Stilwell was a director of the Zinc Company, was

present when the language of the deed was the subject of discussion between the directors of the two companies; the deed, as amended, was read over by him to the directors of the Zinc Company, and he was present when it was accepted.

The witnesses are certainly intelligent, and had opportunities of knowing the facts. All the exceptions which have been taken to the credibility of their evidence is not sufficient to shake or materially to impair the force of their united testimony. It cannot be denied that there are circumstances connected with this transaction which excite distrust, and which, if clearly established, might, upon a proper case, have entitled the stockholders of the Zinc Company to relief as against the act of their own officers. It is shown that the deed was executed to the Zinc Company for the purpose of carrying the agreement between the two companies into effect, which it clearly does not do, inasmuch as it does not convey all the property to which the Sussex Company were entitled under their deed from Fowler. No evidence of the alleged agreement to change the terms of the conveyance is found upon the minutes of either company; and evidence is offered, on the part of the Zinc Company, tending to show that the individual interests of the directors were, or might have been, hostile to the interests of the other stockholders, and that the change in the terms of the conveyance were in a high degree prejudicial to the interests of the Zinc Company. Let all this be conceded, the facts are nevertheless established by the evidence, that the deed, as executed, was accepted by the Zinc Company, upon deliberation, as a performance of the agreement on the part of the grantors. The alleged reasons for the acceptance of the title, viz. that the deed, as executed, conveyed all the title that Fowler intended to convey, or all that the grantees took or claimed under the conveyance, or that its terms were contradictory and absurd, may or may not have been justified by the facts of the case. But

they suffice to show that the change of terms was not necessarily fraudulent, and may have been made with an honest purpose. And not only was the title accepted by the Zinc Company, but they recognised its validity, and continued to claim title under it, recognising the adverse rights of the Franklinite Company down to the time of the commencement of this suit.

The charge of fraud in the alteration of the deed is not sustained upon the pleadings and evidence in the cause. There is no ground upon which the conveyance in question can be set aside as fraudulent or reformed on the ground of mistake—neither the frame nor the prayer of the bill is adapted to such relief.

This conclusion renders it unnecessary to consider another ground, urged by the defendants' counsel upon the argument, viz. that the Boston Franklinite Company is a purchaser, for a valuable consideration without notice, of all the rights of the New Jersey Franklinite Company, and cannot be affected by a secret equity in favor of the complainants as against the latter company.

The Boston Franklinite Company have acquired all the rights of the New Jersey Franklinite Company to the premises in question; their title rests upon the legal effect and operation of the deed of the eighth of March, eighteen hundred and fifty-two, from the Sussex Company to the New Jersey Zinc Company. It is not limited to the franklinite and iron ores, when they exist separate and apart from the zinc, but includes all the franklinite and iron ores embraced within the terms and legal effect of the exception in the deed.

II. Is the ore in question a zinc ore, which passed by the terms of the grant to the Zinc Company, or is it a franklinite or iron ore within the exception in the deed, which was reserved to the Franklinite Company? The terms of the grant, it will be remembered, are "all the zinc and other ores, except franklinite and iron ores." The incontrovertible fact is, that the mass consists of zinc

ore and franklinite in such close mechanical combination that neither can be taken from the mine without removing the other. Which party, by the terms of the deed, has title? Each party claims the entire mass—one or the other must take it.

Each party has a freehold estate in the thing granted. There may be within the same territorial limits distinct estates of inheritance. The different stories of the same dwelling may be held in fee by different owners. The title to the surface of the soil may be in one person, the title to the mines, or different strata under the surface, may be in others. Neither of these parties own the surface of the soil beneath which the ores are found. The title to the surface is in Fowler, to the zinc in the complainants, to the franklinite in the defendants. The deeds are in the ordinary form of a conveyance of real estate, and purport to convey a title to land. They are not grants of hand specimens or isolated minerals, but of masses of ore in *situ*.

The value of the minerals granted consists in their adaptation for the furnace and the production of metals in bulk. The terms "zinc ores," "franklinite and iron ores," are used as a description of the land granted and reserved. Whether the subject of the grant be designated by metes and bounds, or by name, or by description of its character, is immaterial. A deed for all the cedar swamp on Pole branch, in the township of A., would be as effectual to convey the land as though it were described by metes and bounds or by its name of Whitcacre; and the grantee would take not the cedar trees growing upon the tract, but the entire tract falling within the description, though trees of other varieties might be found within its limits. A deed for a mine with mining privileges is not a mere license to take away ore, or the grant of an easement or other incorporeal hereditament, but of a part of the freehold. *Caldwell* v. *Fulton*, 31 *Penn. St. R.* 475; *Grubb* v. *Bayard*, 2 *Wallace, jr.* 81.

2 F*

The grantee takes not an incorporeal hereditament, but an estate in the land itself, for which an ejectment will lie. *Comyn* v. *Kynto*, *Cro. Jac.* 150; *Whittingham* v. *Andrews*, *Salk.* 255; *Adams on Eject.* 20; *Turner* v. *Reynolds*, 11 *Harris* 199. And which is subject to dower. *Stoughton* v. *Leigh*, 1 *Taunt.* 402; *Park on Dower* 116, 120; 1 *Crabb on Real Estate* 98; 1 *Washburne on Real Prop.* 166.

The deeds must be construed as any other deeds for land, subject to the qualification necessarily imposed by the limited character of the thing granted and a due regard for the rights of others having interests in the same land. Thus, though the grant include all the ores, sufficient support must be left for the surface, the title to which is in another party. The owner of the lower story of a dwelling cannot deprive the upper stories, which are owned by others, of their support. *Harris* v. *Ryding*, 5 *Mees & W.* 60; *Humphries* v. *Brogden*, 12 *Queens B.* 739; *Jeffries* v. *Williams*, 5 *Excheq.* 792; *Smart* v. *Norton*, 5 *Ellis & B.* 30.

In construing the deeds, reference must be had, in order to ascertain the intention of the parties, to the existing state of knowledge of the subject matter, the received meaning of the terms employed, and the usages prevailing at the date of the conveyance, rather than to the time of the alleged injury. Thus, when doubts arise in regard to the true meaning or application of a term used in the deed, the meaning of which may have changed, in order to ascertain the true import of the term used by the parties, and the application of it to the proper subject matter, recourse must be had to its popular signification at the date of the deed. So where the construction or effect of the deed depends upon local usage, it must be referred to the usage existing at the date of the deed. *Harris* v. *Ryding*, 5 *Mees & W.* 69, per Parke, B.; *Smart* v. *Morton*, 5 *Queens B.* 30.

If this view of the nature of the title of the respective parties be correct, it follows that the controversy does not

regard the ownership of the ores merely when mined or detached from the soil, but involves the title to the free-hold or inheritance. It is upon this ground that the in-junction is allowed. 1 *Story's Eq. Jur.* § 929; *Thomas* v. *Oakley*, 18 *Vesey* 184; *Livingston* v. *Livingston*, 6 *Johns. C. R.* 497; *Merced Mining Co.* v. *Fremont*, 7 *Cal.* 318.

The ownership of the property is in no sense joint. It is not in the same, but in distinct things. No partition of their interest could be made. Each claims title to the whole mass of the ore in the same vein or stratum. One or the other must be entitled to it. The deeds were not intended to convey, and do not convey, distinct interests in the same lode, vein, or stratum. Some test must be applied by which the title to each vein, or distinct portion of a vein, can be ascertained to belong to one or the other of the parties.

It is satisfactorily shown by the evidence that, at the dates of the deeds in which this controversy has its origin, and as late as the year 1853, the masses or veins of ore upon Mine Hill were regarded and known as franklinite. The ore was so called by the proprietors of the mines and by the miners themselves. It was so described in scientific treatises and in geological reports. It was so classified and arranged in mineralogical cabinets and exhibitions. The mass was known not to consist entirely of that mine-ral. Pure specimens or crystals of franklinite were known to exist only in small and unimportant bodies, having no value for practical purposes. In the general mass of the ore, there was mingled with the franklinite, ores of zinc and other minerals in various proportions. But so far as was known, franklinite constituted the predominating element which gave character and title to the mass. Zinc ore had been discovered and used in at least one locality, but no well defined vein of zinc ore had been developed. Upon Stirling Hill, in the immediate vicinity, distinct, well defined veins of zinc and franklinite had been de-veloped, and the zinc vein extensively worked. Here, as

on Mine Hill, the ores were found to some extent in me-
chanical combination. Both veins contained more or less
of each mineral. In the zinc vein the red oxide of zinc
predominated; it formed the enveloping mass which gave
name and character to the ore, and though grains of frank-
linite were found extensively disseminated throughout the
mass, it was universally known and designated as zinc ore.
On Stirling Hill, the separate lodes, though in immediate
contact, were generally well defined and distinguished by
clear lines of demarcation. From the general geological
character of the vicinity, it was anticipated that, in the
progress of investigation, a similar distinct and well de-
fined vein of zinc ore would be developed upon Mine
Hill. Upon this state of facts within the knowledge of
the parties, there seems to be no room for rational doubt
as to what the parties intended by the terms used in the
deed as descriptive of the subject matter of the convey-
ance. By "zinc ores" was meant those veins or lodes in
which the ore of zinc was the predominating ore, and by
"franklinite," not the pure mineral of that name, which
was never found except in small and detached specimens,
but those veins or lodes in which franklinite predominated,
and which was known and designated as franklinite ore.
The instrument must be construed according to the mind
and intent of the parties at the time it was executed. It
is no valid objection to this construction that franklinite
is a mineral, and not a metal, and that, speaking with
scientific precision, there is no such thing as a franklinite
ore, in the sense in which we speak of a zinc or iron ore.
The question is not, what is the scientific import of the
terms, but in what sense the parties to the contract under-
stood and used them. The evidence abundantly shows
that the term franklinite was in constant and familiar use
to designate the ore or mass in which that mineral pre-
dominated.

The same view of the import of the terms seems to have
prevailed in the minds of the parties down to the time of

the commencement of this suit. The complainants, in their original bill, claim that the defendants own none of the ores except the franklinite when it exists separate from the zinc, and allege that the defendants were mining and using the ore in controversy under the pretence that the opening, or mine, contains nothing, or nearly nothing, but franklinite, whereas the complainants allege that zinc ore is the predominating ore in said opening, or at least constitutes a very large proportion of the ore therein. The Franklinite Company, in their answer, allege that in all the veins yet discovered on Mine Hill franklinite is the predominating metal; that the ore in excess gives name and character to the vein. And they further allege, that in the working of the ore taken by them from the new opening not more than fifteen per cent. of zinc has been extracted.

The evidence shows that the vein or lode in which the mine called the new opening is situated, at the date of the deeds and down to the commencement of this controversy, was known and designated as a franklinite vein, and that in the great mass of mineral substances in the vein, as far as developed, franklinite predominates. The evidence further shows that, taking the entire aggregate of the ores which have been taken from the mine by both companies, there has been a very decided excess of franklinite over the zinc ore in the mass.

The complainants insist, nevertheless, that the title to the mine is in them, because the entire mass of ore therein, including as well the franklinite as the zinc, existing as it does in intimate mechanical combination, constitutes a zinc ore within the letter of the grant. Upon this and kindred points involved in the inquiry, a great amount of valuable testimony has been given by witnesses distinguished for their scientific attainments and practical skill as mineralogists. The court acknowledges its obligation for the light thus afforded, which has served to render some of the points of inquiry entirely clear. The evi-

dence, indeed, has satisfactorily settled most of the inci-
dental questions of fact which have arisen in the cause;
and although there are conflicts in the testimony upon
matters of opinion, and still more upon matters of infer-
ence, yet, upon a careful review of the evidence, and an
examination of the very elaborate arguments of counsel,
I do not find any essential difference in the result of the
various analyses nor upon the material questions of fact
bearing upon the result of the controversy. I shall there-
fore content myself by stating, in the progress of the
opinion, what I understand to be the clear result of the
testimony, without referring to it in detail or naming the
witnesses, and without adverting to occasional conflicts
which do not affect the general result.

I think the evidence does show, as claimed by the com-
plainants, that the bulk of the ore in question (I refer
more especially to what is called by the witnesses the gray
ore) is properly called zinc ore. It is, in other words, a
mineral body containing so much of the metal of zinc as
to be worth smelting. It is shown that it has been profit-
ably worked for the zinc which is extracted from it, and
hence, in popular understanding, as well as in strict tech-
nical meaning, it would be called an ore of zinc. And if
the deed to the Zinc Company contained a simple grant
of all the zinc ore, without exception, found or to be
found in the tract, the argument in favor of their title to
the entire mass would certainly be very strong, not only
because the ore would fall directly within the description
of the grant, but because, in case of any doubt, the grant
must be taken most strongly against the grantor. But the
grant is of all the zinc and other ores, except franklinite
and iron ores. The franklinite is expressly excepted from
the grant, and to adopt the construction contended for
would be to nullify the exception, or to restore the clause
contained in the deed from Fowler to the Sussex Com-
pany, " except the franklinite or iron ores, when it exists
separate from the zinc." Either construction is inadmis-

sible, because it would be in conflict with the terms of the grant. If the grant had been of all the zinc ore except the red oxide of zinc, the red oxide of zinc would not have passed by the grant simply because it is expressly excepted. It would add no strength to the claim of the grantee to demonstrate that the mass in which the red oxide was found constitutes a good zinc ore, because the grantors could never have intended, by the term zinc ore, to have included the red oxide, which by the express terms of the grant is excepted.

It is further insisted, on the part of the Zinc Company, that whether a particular ore shall be called zinc ore on the one hand, or franklinite or iron ore on the other, does not depend upon the preponderance of zinc or oxide of zinc upon one hand, or of franklinite or oxide of iron upon the other, but on the relative value of the respective products, after taking into account the expense of extracting the same.

It was suggested, upon the argument, that this ground of defence was inadmissible, as it was an entire departure from the ground of claim set up by the Zinc Company in the original bill, and upon which an issue was made by the answer to that bill. But a bill in the nature of a supplemental bill is not an addition to the original bill, but another original bill, to which a new defence may be made. *Story's Eq. Pl.* § 353; *Mitford's Pl.* 72; 3 *Daniels' Chan. Pr.* 1686.

The complainant in the original bill, in his answer to the supplemental bill, is not controlled by the averments of the bill, nor limited to the same grounds in support of his title.

The evidence offered upon this point suffices to show that, either in scientific or metallurgical nomenclature, an ore containing different metals may be, and ordinarily is termed an ore of that metal for which it is only or primarily worked; and that the ore in question, being more valuable as a zinc than as an iron ore, and being worked

for its zinc, is properly a zinc ore. I do not understand it to be insisted, and it certainly is not established by the evidence, that an ore is properly called an ore of that metal *only* for which it may be most profitably worked, or that there is any inflexible rule adopting the value of the product as a test of the name of the ore. The extent of the evidence, I think, is that the ore would more usually and more properly be styled an ore of that metal for which it is primarily and most profitably worked. Assuming it to be satisfactorily established that this ore may be most profitably worked for its zinc, and that it may, by that principle of classification, be termed a zinc ore, the important question still remains, was that the mode of classification adopted by the parties to the deed in question? Did they so understand it? Was that the meaning they attached to it? Upon this point, as has been already said, the evidence is decisive. No such mode of classification, as the relative value of the respective metals was (so far as appears by the evidence) ever adopted by or known to the parties at the date of the deed, but on the contrary, the ore was known and designated by the preponderance of the metal contained in the vein, without regard to its value; and that by those who owned it, who dealt in it, who used it, and who classified it, the ore of the vein in question was known and designated as franklinite. It is immaterial, therefore, by what other or different name the ore may be called. It is obvious, moreover, that the system of classification of ores, by the relative value of the metals contained in them, however proper it may be in the nomenclature of mineralogists or metallurgists, can never be adopted to settle the construction of a deed or the title to the ore. The name would be liable to constant fluctuation, depending upon the fluctuation in the market price of the respective metals, the locality in which the ore is found, and the facilities for working it. It would convert the franklinite itself into an ore of zinc. The title to the ore certainly could not

fluctuate with the change of name—that was fixed by the delivery of the deed.

Another ground relied upon by the Zinc Company is, that the vein of ore in which the new opening is made is found, upon careful examination, to consist of two distinct layers or strata. That one of these strata contains so large an admixture of zinc ore in some of its shapes, either as red oxide, silicate, or carbonate of zinc, as to constitute the preponderance of the mass, and to form with the franklinite a good zinc ore. This claim applies to what is usually termed the gray ore, as distinguished from the black ore taken from the new opening, and is the ore which has mainly been mined and taken away by the Zinc Company.

It is admitted that this ore is taken from a part of the great west vein, which is known as franklinite, and in the aggregate ore of which, including as well the black as the gray ore, the franklinite greatly predominates. It is claimed that the gray ore, containing a large admixture of the red oxide of zinc, constitutes a distinct and clearly defined stratum or layer in that vein to which the Zinc Company have title. The existence of this distinct layer or stratum is denied. It is admitted that certain portions of the vein contain more zinc than others, and that the ores vary in color; but it is insisted by the Franklinite Company that these portions are not found in distinct layers or strata, or in segregated masses or deposits, but are scattered irregularly and indiscriminately through the vein. Upon this point there is much conflict in the evidence. The fact of the existence of such distinct stratum is not established. The burthen of proof upon this point is upon the Zinc Company. The ore is taken from part of a franklinite vein, and from a mine in which the great mass of the ore is franklinite. If this particular portion of the vein belongs to the Zinc Company, the existence of the stratum or deposit to which they claim title should be clearly shown.

But admitting the existence of a distinct and well defined stratum within the mine in which the ore in question is found, the evidence does not show an excess of zinc over the franklinite. On the contrary, the average of the analyses show a clear preponderance of franklinite over the zinc in the mass of the ore in question.

The Zinc Company have not shown a title to the mine called the new opening, nor a right to the ores taken therefrom, either by themselves or by the Franklinite Company. The injunction against the Franklinite Company must be dissolved, and the bill dismissed with costs.

In the case of the Boston Franklinite Company against the Zinc Company, a reference will be ordered to take an account, and the injunction against the Zinc Company continued till the final hearing. This direction is given upon the assumption that the dismissal of the original bill does not finally dispose of the case upon the bill in the nature of a supplemental bill. Such appears to be the rule. No allusion was made to the point upon the argument, and counsel will be heard upon it, if desired, before the signing of the decree.

I have entertained strong doubts touching the propriety of holding either of these injunctions, and it is with hesitation that the cases are now decided upon their merits. The controversy involves a question of title to real estate. A court of equity will rarely interpose by injunction to restrain the working of mines until the right is established at law. *Eden on Injunc.* 112, (*Waterman's ed.*) 194.

And where an injunction is granted, the course most consistent with the practice and inclination of the court is to have the right tried at law. *Grey* v. *Duke of Northumberland*, 17 *Vesey* 281.

But the case has been peculiarly situated. The injunction in favor of the Zinc Company against the Franklinite Company, who were originally in possession, has been of long standing. No motion has been made to dissolve it, nor has either party asked a trial of the title at law or

questioned the propriety of the injunctions upon this ground. Both parties have sought a decision, by this court, of the question upon the merits. Evidence has been taken affecting the entire question at issue, and the cause argued exclusively upon the question of title. The cause was heard with the understanding that a decision of the question of right was desired, to the end that the important questions involved should be speedily and finally decided by the court in the last resort. Under these circumstances the question is decided, aside from all questions of a technical character, exclusively upon its merits, believing that the ends of justice will thereby be most effectually promoted.